FILED
IN CLERKS OFFICE

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

2008 DEC 22 ⊃ 1: 29

U.S. DISTRICT COURT
DISTRICT OF MASS.

FRESENIUS MEDICAL CARE
HOLDINGS, INC,

        Plaintiff,

v.

UNITED STATES OF AMERICA,

        Defendant.

**08 CA 1 2 1 1 8 PBS**

Case No. _____

**Jury Demand**

MAGISTRATE JUDGE Sorokin

## COMPLAINT

Plaintiff, Fresenius Medical Care Holdings, Inc. ("FMCH"), brings this action arising

under the Internal Revenue Code ("IRC") for the recovery of income taxes and related interest

that has been erroneously or illegally assessed and collected from FMCH by the Internal

Revenue Service ("IRS"). FMCH alleges as follows:

1.     In January of 2000, Defendant United States of America and FMCH negotiated a

global resolution of all potential civil and criminal charges arising out of a government

investigation into the activities of various FMCH subsidiaries that took place under prior

management and ownership.

2.     The global resolution included criminal fines and civil payments. The criminal

aspects of the global resolution were set forth in three plea agreements, and resulted in the

imposition of a total criminal fine of approximately $101 million. The civil aspects of the global

resolution were set forth in four civil settlement agreements. Under the terms of these civil

settlement agreements, FMCH paid a total of approximately $385 million in return for the

release of FMCH and its affiliates from a variety of potential statutory and common law civil

claims. In each and every civil settlement agreement the parties acknowledged that, "nothing in

this Agreement is punitive in purpose or effect." FMCH made the payments required under the civil settlement agreements in tax years 2000 and 2001.

3.      FMCH timely filed with the IRS consolidated Forms 1120 (Federal Income Tax Returns) for the taxable years 1999, 2000 and 2001.

4.      FMCH deducted on its federal income tax returns the approximately $385 million it paid in 2000 and in 2001 under the civil settlement agreements as an ordinary business expense.

5.      The IRS disallowed roughly half of this $385 million deduction.  Despite the fact that the parties' settlement agreements specifically stated that "nothing in this Agreement is punitive in purpose or effect," and despite the fact that Department of Justice had specifically designated $101 million of the global resolution as a criminal fine, the IRS took the position in the FMCH tax audit that half of the civil settlement payments were in fact "punitive," and therefore not deductible from income pursuant to IRC § 162(f).  The IRS based its unilateral and retroactive determination of what constituted the allegedly "punitive" portion of the payments made under the civil settlement agreements by reference to an internal government report, which was created after the settlements to show how the settlement payments were disbursed to various government entities or otherwise documented.  This report is never disclosed or made available to taxpayers in the ordinary course of events.  Consequently, FMCH had no knowledge of the report when it was preparing its tax returns.

6.      FMCH also deducted $16.5 million paid in 1999 under another civil settlement agreement that contained similar language that explicitly specified the non-punitive purpose and effect of the civil settlement agreement. The IRS disallowed $11 million of this deduction as well, for the same reason it disallowed the other deductions.

2

7.     FMCH paid the additional taxes and interest relating to the disallowed deductions.

8.     FMCH, on February 17, 2007, timely filed amended returns (Forms 1120X)
seeking a refund of the taxes and interest it paid relating to the disallowed deductions.

9.     Forms 1120X were timely filed by FMCH for each of the years 1999, 2000 and
2001. 1999 is at issue primarily because a net operating loss for 2000 was carried back to 1999.

10.    The IRS Appeals Division considered the amended returns in an administrative
proceeding by which allowed FMCH to deduct an additional $69,095,423 (amounts designated
in the civil settlement agreements as relator fees) of amounts paid pursuant to the civil
settlements.

11.    These additional deductions, plus an additional deduction of $733,896 on an
unrelated matter, resulted in a refund to FMCH of $22,281,923 for 1999 and $2,158,339 for
2001, exclusive of interest.

12.    The resolution with IRS Appeals permitted FMCH to file this lawsuit to seek a
refund of the taxes and related interest attributable to the remaining disallowed deductions.

13.    A favorable resolution for FMCH will require computational and correlative
adjustments for each of the years 1999, 2000 and 2001, as is more fully explained in each of the
Forms 1120X for those years.

14.    FMCH now brings this action to seek refund of the taxes it has paid as a result of
the remaining disallowance by the IRS of the deductions of these civil settlement payments, as
well as any interest and refund of taxes that may arise due to any correlative or computational
adjustments.

3

## PARTIES, JURISDICTION AND VENUE

15.     Plaintiff FMCH, employer identification number 13-3461988, is a New York

corporation with its principal office and principal place of business in Waltham, Massachusetts.

16.     The Defendant is the United States of America.

17.     This Court has jurisdiction pursuant to 28 U.S.C. § 1346(a)(1) and 26 U.S.C.

§ 7422 and venue is proper pursuant to 28 U.S.C. § 1402.

## BACKGROUND

### I.     Background of FMCH.

18.     Prior to February 1996, National Medical Care, ("NMC") a health care company,

was a wholly owned subsidiary of W.R. Grace & Co. ("Grace").

19.     NMC, in turn, was managed through three principal divisions, including the

Dialysis Services Division, the Medical Products Group ("MPG") and the NMC Homecare

Division ("NMC Homecare").

20.     These three NMC divisions primarily provided kidney dialysis services,

manufactured and distributed kidney dialysis equipment and supplies, performed clinical

laboratory testing, and provided home health services.

21.     NMC also owned another subsidiary, LifeChem, Inc. ("LifeChem"), a clinical

blood laboratory that was part of the MPG division.

22.     In the early fall 1995, Grace took the initial steps to spin off NMC into an

independent company.

23.     In October 1995, NMC received five subpoenas from various arms of Defendant,

including the Department of Health and Human Services' Office of Inspector General ("OIG")

and the United States Attorney's Office for the District of Massachusetts.

4

24.     On October 18, 1995, Grace announced that, because of the subpoenas, NMC's contemplated spin off would not be completed until the first quarter of 1996.

25.     On February 4, 1996 Grace and Fresenius AG, a German company involved in the manufacture and distribution of pharmaceuticals and medical systems (including products used in kidney dialysis treatment), entered into an agreement that would functionally combine NMC with Fresenius AG's existing dialysis business.

26.     The transaction combining the NMC business and the Fresenius dialysis operation in the United States closed on September 27, 1996 (the "Transaction").

27.     As a result of the Transaction, a new group was formed, consisting solely of the parent holding corporation of Grace and NMC.  The parent holding corporation of Grace changed its name to FMCH.

28.     After the Transaction, the management of Grace was no longer involved in the management of FMCH.

**II.     Government Investigation of National Medical Care.**

29.     On October 17, 1995, prior to the Transaction, NMC received the subpoenas from the Government.

30.     These subpoenas were apparently triggered by several *qui tam* actions pending at the time the subpoenas were issued.

31.     The subpoenas were part of a civil and criminal Government investigation into possible overcharging of federal entities for products and services by NMC subsidiaries ("the Investigation").

32.     The Investigation concerned possible violations of federal statutes, including the anti-kickback statute, the False Claims Act, the Program Fraud Civil Remedies Act, and other

5

common law claims, including payment by mistake, unjust enrichment, breach of contract and fraud.

33.     After the Transaction, FMCH and its counsel dealt with the Government. FMCH cooperated with the Investigation. From the outset, FMCH endeavored to resolve globally the Investigation, which concerned activities that took place prior to the Transaction.

34.     One of the potential consequences that FMCH, NMC, and their subsidiaries faced as a result of the Investigation was a possible prosecution for health care fraud related offenses that carried mandatory administrative exclusion from Medicare and other federal health care reimbursement and payment programs in the event of conviction.

35.     Exclusion would have crippled FMCH's health care and dialysis services businesses because a large percentage of FMCH's business is to provide life saving health care services to Medicare beneficiaries suffering from End Stage Renal Disease.

36.     The Government and FMCH engaged in extensive negotiations over a period of more than three years prior to reaching a global agreement resolving all potential civil and criminal claims against FMCH and NMC in early 2000.

37.     As described below, FMCH, NMC and their subsidiaries and the Defendant documented the global agreement in a series of simultaneously executed and interrelated agreements, three criminal agreements and four civil agreements, with each agreement only effective if each other agreement was signed. ("Global Agreement").

38.     The Global Agreement (attached as Exhibits A-H) was executed on January 18, 2000.

6

**III.    The Interdependent Structure of the Global Agreement.**

39.    The Global Agreement was a single agreement comprised of eight interdependent agreements: a master agreement and seven underlying agreements between FMCH and Defendant. (*See* Ex. A, pp. 2, 5.)

40.    In the Global Agreement, Defendant—acting through the Department of Justice ("DOJ")—agreed to decline to prosecute FMCH, NMC, their parents and related entities, except NMC divisions LifeChem, MPG and NMC Homecare. (*See* Ex. A, p. 1.)

41.    The Global Agreement was "contingent on (1) guilty pleas of NMC Homecare, LifeChem, and MPD, as set forth in the [criminal agreements] which are being signed contemporaneous with this Agreement . . . and (2) FMCH, NMC and their related entities performing all of their obligations as set forth in [the master] agreement and the four civil settlement agreements . . . If such guilty please are not accepted by the court or are withdrawn for any reason, or if FMCH, or a related entity, should fail to perform an obligation under one of the [Civil Agreements], this [Global Agreement] shall be null and void." (*See* Ex. A, p. 2).

42.    The Global Agreement included criminal fines totaling $101,186,898, civil payments totaling $385,147,334, and required criminal plea agreements.

43.    FMCH has performed all its obligations under the Global Agreement.

**IV.    The Criminal Agreements.**

44.    Three of the seven underlying interrelated agreements (attached as Exhibits B, C and D) were criminal plea agreements ("Criminal Agreements") between Defendant and LifeChem, the MPG division and NMC Homecare.

7

45.     As set out in the Criminal Agreements, each of the three NMC subsidiaries

pleaded guilty to conspiracy to defraud Defendant under various federal statutes. (*See* Ex. B, p.

1; Ex. C, p. 1; Ex. D, p. 1.)

46.     The Criminal Agreements also required the NMC subsidiaries to pay "criminal

fine[s]" totaling $101,186,898.  (*See* Ex. B, p. 2; Ex. C, p. 2; Ex. D, p. 2.)

47.     Each Criminal Agreement calculated the criminal fine associated with that

agreement using a four-step process, which took into account the "loss to the United States from

this offense," the "culpability score," the multiplier, and an upward or downward departure.  (*See*

Ex. B, p. 2; Ex. C, p. 2; Ex. D, p. 2.)

48.     The Government drafted each of the three Criminal Agreements.

**IV.     The Civil Agreements.**

49.     The other four underlying interrelated agreements were civil settlement

agreements ("Civil Agreements") between Defendant and FMCH, NMC and the NMC

subsidiaries.

50.     As part of the Global Agreement, Defendant and FMCH, NMC, and NMC

subsidiaries executed four Civil Agreements.

51.     These four Civil Agreements are called (1) "NMC Homecare," (2) "LifeChem"

(3) "credit balances" and (4) "Doppler Flow Test/BIA tests" agreements (attached as Exhibits E,

F, G and H respectively).  (*See* Ex. A, p. 2.)

52.     The Government drafted each of the four Civil Agreements.

53.     In the Civil Agreements, FMCH and the identified subsidiaries that were parties

to each of the four agreements denied all allegations made by Defendant, except those specific

8

activities described in the Criminal Agreements. (*See* Ex. E, p. 12; Ex. F, p. 10; Ex. G, p. 6; Ex. H, p. 5.)

54.     The Civil Agreements also released FMCH, NMC and the NMC subsidiaries from all claims by the plaintiffs (relators) in the *qui tam* actions related to the Global Agreement. (*See* Ex. E, pp. 31-35; Ex. F, pp. 21-22; Ex. G, pp. 21-25.)

55.     The Civil Agreements required that FMCH pay a total of $385,147,334 to Defendant.

A.     *NMC Homecare Agreement.*

56.     The NMC Homecare agreement stated that Defendant had "civil claims" against FMCH and its related entities, and required FMCH and NMC to pay $253,334,594 "to resolve civil liabilities." (*See* Ex. E, pp. 6, 14.)

57.     The NMC Homecare agreement also required that FMCH "agree that nothing in this Agreement is punitive in purpose or effect." (*See* Ex. E, p. 37.)

58.     The NMC Homecare agreement also had a merger clause that states: "This Agreement ... constitute[s] the complete agreement among the parties with regard to the conduct [described in the preamble]." (*See* Ex. E, pp. 46-47.)

B.     *LifeChem Agreement.*

59.     The LifeChem agreement, which "addresse[d] the [Defendant's] civil claims" against FMCH and its related entities, required FMCH and NMC to pay $112,160,000. (*See* Ex. F, p. 10.)

60.     The LifeChem agreement also required that FMCH "agree that nothing in this Agreement is punitive in purpose or effect." (*See* Ex. F, p. 22.)

9

61.     The LifeChem agreement also had a merger clause that states: "This Agreement ... constitute[s] the complete agreement among the parties with regard to the conduct [described in the preamble]." (*See* Ex. F, p. 29.)

C.     *Credit Balances Agreement.*

62.     The credit balances agreement stated that Defendant had "civil claims" against FMCH and its related entities and required FMCH and NMC to pay $16,817,708. (*See* Ex. G, pp. 3-4, 6-7.)

63.     The credit balances agreement also required that FMCH "agree that nothing in this Agreement is punitive in purpose or effect." (*See* Ex. G, p. 26.)

64.     The credit balances agreement also had a merger clause that states: "This Agreement ... constitute[s] the complete agreement among the parties with regard to the conduct [described in the preamble]." (*See* Ex. G, p. 35.)

C.     *Doppler Flow Test/BIA Tests Agreement.*

65.     The Doppler Flow Test/BIA tests agreement or "diagnostic tests" agreement stated that Defendant had "civil claims" against FMCH and its related entities, and required FMCH and NMC to pay $2,835,032. (*See* Ex. H, pp. 2, 4, 5-6.)

66.     The diagnostic tests agreement also required that FMCH "agree that nothing in this Agreement is punitive in purpose or effect." (*See* Ex. H, p. 17.)

67.     The diagnostic tests agreement also had a merger clause that states: "This Agreement ... constitute[s] the complete agreement among the parties with regard to the conduct [described in the preamble]." (*See* Ex. H, p. 26.)

**V.     BioTrax Investigation and Agreement.**

68.     In March 1994, NMC acquired the assets of BioTrax International, Inc.

69.     On October 31, 1996, BioTrax International, Inc. and NMC Diagnostics, Inc. (collectively "BioTrax"), both subsidiaries of NMC, received subpoenas from the OIG.

70.     These subpoenas were apparently triggered by several *qui tam* actions pending at the time the subpoenas were issued.

71.     Arms of the Government, specifically OIG and the United States Attorney's Office for the Eastern District of Pennsylvania, issued the subpoenas in conjunction with an investigation concerning possible submission of false or improper claims to the Medicare program.

72.     These subpoenas concerned activities by BioTrax that took place prior to the Transaction.

73.     On May 13, 1999, BioTrax, NMC and FMCH reached an agreement with Defendant to settle Defendant's claims against BioTrax. ("BioTrax Agreement," attached as Exhibit I.)

74.     In the BioTrax Agreement, FMCH and its subsidiaries that were parties to the agreement denied all allegations made by Defendant. (Ex. I, p. 7.)

75.     The BioTrax Agreement also released FMCH and its subsidiaries from all claims by the plaintiffs (relators) in the *qui tam* actions. (Ex. I, p. 13.)

76.     FMCH has performed all its obligations under the BioTrax Agreement.

77.     The Government drafted the BioTrax Agreement.

78.     The BioTrax Agreement stated Defendant had "civil claims" against BioTrax, FMCH and NMC, and required FMCH and NMC to pay $16,500,000. (Ex. I, p. 9.)

79.     The BioTrax Agreement also required that FMCH agree that "this Agreement is not punitive in purpose or effect." (Ex. I, p. 16.)

11

80.     The BioTrax Agreement had a merger clause that states: "This Agreement constitutes the complete agreement among the Parties."  (Ex. I, p. 20.)

## VI.     Applicable Tax Code Sections and Regulations.

81.     IRC § 162(a) allows "as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business . . . ."

82.     Payments to settle civil liabilities may be ordinary and necessary business expenses.

83.     IRC § 162(f), however, states that "No deduction shall be allowed under subsection (a) for any fine or similar penalty paid to a government for the violation of any law."

84.     Treasury Regulation § 1.162-21(b)(2) states that "compensatory damages . . . paid to a government do not constitute a fine or penalty."

### COUNT I - 1999

85.     FMCH incorporates the allegations in Paragraphs 1 through 84 as if fully set forth here.

## I.     Global Agreement

86.     The IRS did not participate in the negotiations of the Global Agreement.

87.     The IRS is not a party to the Global Agreement.

### A.     FMCH's Deduction of the Civil Agreements Payments.

88.     Each Civil Agreement had a merger clause stating that, "This Agreement . . . constitute[s] the complete agreement among the parties with regard to the conduct [described in that agreement's preamble]."  (Ex. E, pp. 46-47; Ex. F, p. 29; Ex. G, p. 35; Ex. H, p. 26.)

89.     Nowhere in any of the Civil Agreements did the Defendant assert or contend that the payments made pursuant to the agreements were in any way punitive.  To the contrary, the

only reference in the Civil Agreements as to the nature of the payments is that the payments are "not punitive in purpose or effect."

90.     Because they are not "punitive in effect or purpose," the amounts paid by FMCH under the Civil Agreements must be remedial and intended to compensate Defendant and the participating states for their losses resulting from NMC's alleged overcharging for its products and services and the related investigation costs, fees paid to the relators and prejudgment interest.

91.     As remedial and compensatory payments, the amounts paid by FMCH under the Civil Agreements are fully deductible pursuant to IRC § 162(a) and Treasury Regulation 1.162-21(b)(2).

92.     FMCH deducted the $385,147,334 it paid per the Civil Agreements as an ordinary and necessary business expense pursuant to IRC § 162(a).

93.     The deductions were attributable to a payment of $350,413,297 made in 2000 under the Civil Agreements, and a payment of $34,734,037 made in 2001 under the Civil Agreements.

94.     These deductions relate to FMCH's tax liabilities for the years 1999, 2000 and 2001. Nineteen ninety-nine is at issue due to the carryback of a loss from 2000 and other computational and correlative adjustments.

**B.      IRS' Position.**

95.     On July 29, 2005, the IRS issued a Revenue Agent Report, or RAR, which included a Notice of Proposed Adjustment (collectively, "RAR") to FMCH's 1999, 2000 and 2001 tax returns (attached as Exhibit J).

96.     In the RAR, the IRS disallowed $192,596,817 of FMCH's deductions (*See* Ex. J, Form 5701.)

13

97.     The RAR cited to a "Health Care Fraud Tracking Form" ("Tracking Form") for the Global Agreement, prepared by a DOJ attorney.

98.     The Tracking Form set forth how the $385 million FMCH paid under the Civil Agreements was "internally allocated" to the various affected federal and state programs. (*See* Ex. J, p. 7.)

99.     The DOJ attorney prepared the Tracking Form *after* the Global Agreement was executed.

100.    The Tracking Form was an internal DOJ document prepared without any input from FMCH or any entity related to FMCH.

101.    The DOJ did not disclose the Tracking Form to FMCH prior to FMCH's filing of its 1999, 2000 and 2001 income tax returns.

102.    The DOJ never discussed the Tracking Form with FMCH or any of its related entities during the negotiations of the Global Agreement.

103.    According to the IRS' interpretation of the Tracking Form, as set out in the RAR, only $192,550,517 of the approximately $385 million FMCH paid under the Civil Agreements was "actual/compensatory damages" and therefore deductible. (*See* Ex. J, p. 7, Line 29.)

104.    Specifically, the Tracking Form and RAR broke out the approximately $385 million FMCH paid under the Civil Agreement as follows (*see* Ex. J, p. 7):

| Line Item | Amount | RAR Position on Deduction |
|-----------|--------|---------------------------|
| Actual/Compensatory Damages (Line 29) | $192,550,517 | Allowed |
| Relator Fee (Line 27) | $ 65,800,555 | Disallowed |
| Investigation Costs (Line 28) | $  1,188,340 | Disallowed |
| Penalties and Damages (Line 30) | $126,607,922 | Disallowed |

105.    The IRS referred to the allowed "Actual/Compensatory Damages" found in Line 29 as deductible "single" damages. (*See e.g.,* Ex. J, p. 23.)

14

106.   The IRS referred to the disallowed Relator Fee, Investigation Costs and Penalties and Damages as non-deductible "multiple" damages.  (*See e.g.,* Ex. J, p. 23.)

107.   The RAR stated that "FMCH has not established that the entire $385MM million deducted on their consolidated tax returns was deductible under IRC § 162" and that FMCH "is not allowed a deduction in the amount of $192,596,817, representing multiple damages under the False Claims Act, deemed fines and penalties pursuant to IRC § 162(f)."  (*See* Ex. J, p. 40.)

### C.   FMCH's Tax Protest and Refund Claim.

108.   On October 28, 2005, FMCH delivered a protest to the IRS of the RAR's proposed disallowance of the $192,596,817 deduction.

109.   In the protest, FMCH stated that "the full civil settlement amount, $385,147,334, [FMCH] paid to the government was properly characterized as a compensatory payment, deductible as a business expense under [IRC §] 162" and "[t]he proposed disallowance of $192,596,817, based on the RAR's conclusion that the disallowed amount was a fine or penalty, was erroneous."

110.   FMCH requested that the proposed disallowance be reversed.

111.   Prior to a resolution of FMCH's protest with IRS Appeals, FMCH paid all taxes and related interest the IRS said were due.

112.   On February 17, 2007, FMCH timely filed a claim for refund, Form 1120X, for 1999 which claimed a refund of the allocable share of taxes paid by FMCH for 1999 with respect to the disallowed $192,596,817 deduction.

113.   On the same date, February 17, 2007, FMCH timely filed claims for refund, Form 1120X, for 2000 and 2001 which claimed a refund of the allocable share of taxes paid by FMCH for those years with respect to the remaining amounts to IRS disallowed.

114.   The IRS sent FMCH a Notification of Claim Disallowance by letter dated May 30, 2007 (attached as Exhibit K) disallowing the claims for refund for each of the years 1999, 2000 and 2001.

115.   On June 5, 2007, FMCH filed a second protest which, by agreement with the IRS, incorporated the protest dated October 28, 2005 as the basis for FMCH's disagreement with the Notice of Claim Disallowance.

**D.    The IRS Appeals Officer Concedes FMCH May Deduct Part of the Amount the IRS Termed "Multiple" Damages.**

116.   One part of what the IRS considered "multiple" damages and non-deductible was the Relator Fee. (*See* Ex. J, p. 7, Line 27.)

117.   Specifically, in the RAR, the IRS disallowed FMCH's deduction of the Relator Fee of $65,800,555 as "multiple" damages. (*See* Ex. J, p. 30.)

118.   This amount represents the portion of the payments under the Civil Agreements received by the plaintiffs (relators) of the *qui tam* actions pending against FMCH, NMC and their related entities at the time of the Global Agreement. (*See* Ex. E, p. 34; Ex. F, p. 21, Ex. G, pp. 22-24.)

119.   In exchange for these payments, FMCH, NMC and their related entities received releases of the claims the relators made against FMCH, NMC and their related entities in the relators' *qui tam* actions as detailed in the Civil Agreements. (*See* Ex. E, pp. 31-35; Ex. F, pp. 21-22, Ex. G, pp. 21-25.)

120.    Because the Relator Fee was part of the approximately $385 million FMCH paid under the Civil Agreements, FMCH deducted it as part of FMCH's deduction of the entire $385 million.

121.    FMCH requested the refund of the Relator Fee as part of its refund claim for 1999 (and other years at issue) covering the disallowance of the entire $192,596,817 deduction.

122.    FMCH and the IRS reached a partial settlement documented by Form 870-AD (attached as Exhibit L), which concerned the deductibility of the Relator Fee.

123.    This Form 870-AD explicitly allows FMCH to pursue this refund suit.

124.    The IRS conceded that the entire Relator Fee (Line 27) was not punitive, but was rather a remedial and compensatory payment deductible under IRC § 162(a).  Consequently, the IRS agreed that FMCH could deduct the $65,800,555.

125.    Pursuant to this agreement, the IRS refunded $22,281,923 (exclusive of interest) of taxes previously paid for 1999 to FMCH, which included an allowance for the deduction of the Relator Fee from the BioTrax Revenue Agent Report.

126.    Based on agreed tax computations prepared by IRS Appeals, part of the $65,800,555 deduction was allocated to 2001 for which a refund was also issued by the IRS.

**E.    Denial of Remaining Refund.**

127.    The IRS has continued to disallow FMCH's refund claim for a deduction of $126,796,262, the remaining portion of the $192,596,817 originally disallowed by the RAR.

128.    Had the IRS agreed that FMCH could properly deduct the remaining $126,796,262, the IRS would have refunded an additional amount to FMCH for 1999.

**II.    BioTrax Agreement**

129.    The IRS did not participate in the negotiations of the BioTrax Agreement.

17

130.    The IRS is not a party to the BioTrax Agreement.

## A.    FMCH's Deduction of the BioTrax Agreement Payment.

131.    The BioTrax Agreement had a merger clause that states, "This Agreement constitutes the complete agreement among the Parties." (Ex. I, p. 20.)

132.    Nowhere in the BioTrax Agreement did the Defendant assert or contend that the payments made pursuant to the agreements were in any way punitive. To the contrary, the only reference in the BioTrax Agreement as to the nature of the payments is the agreement by the parties that "this [BioTrax] Agreement is not punitive in purpose or effect." (Ex. I, p. 16.)

133.    Because it is not "punitive in purpose or effect," the amount paid by FMCH under the BioTrax Agreement must be remedial and intended to compensate Defendant for its losses resulting from BioTrax's alleged overbilling of Medicare and the related investigation.

134.    As remedial and compensatory payments, the amount paid by FMCH under the BioTrax Agreement is fully deductible pursuant to IRC § 162(a) and Treasury Regulation 1.162-21(b)(2).

135.    FMCH deducted the $16,500,000 it paid per the BioTrax Agreement as an ordinary and necessary business expense pursuant to IRC § 162(a).

136.    The deduction was attributable to a payment of $16,500,000 made in 1999 under the BioTrax Agreement.

137.    This deduction relates to FMCH's tax liabilities for the year 1999.

## B.    IRS' Position.

138.    On July 5, 2005, the IRS issued a Revenue Agent Report, which included a Notice of Proposed Adjustment (collectively, "BioTrax RAR," attached as Exhibit M) to FMCH's 1999 tax return.

139.    In the BioTrax RAR, the IRS disallowed $11,000,000 of FMCH's deduction. (*See* Ex. M, p. 5.)

140.    The RAR cited to a "Health Care Fraud Tracking Form" ("BioTrax Tracking Form") prepared by a DOJ attorney.

141.    The BioTrax Tracking Form set forth how the $16.5 million FMCH paid under the BioTrax Agreement was "internally allocated" to various entities, including Medicare. (*See* Ex. M, p. 5.)

142.    The DOJ attorney prepared the BioTrax Tracking Form *after* the BioTrax Agreement was executed.

143.    The BioTrax Tracking Form was an internal DOJ document prepared without any input from FMCH or any entity related to FMCH.

144.    The DOJ did not disclose the BioTrax Tracking Form to FMCH prior to FMCH's filing of its 1999 income tax return.

145.    The DOJ never discussed the BioTrax Tracking Form with FMCH or any of its related entities during the negotiations of the BioTrax Agreement.

146.    According to the BioTrax Tracking Form, as set out in the BioTrax RAR, only $5,500,000 of the $16.5 million FMCH paid under the BioTrax Agreement was "actual/compensatory damages" and therefore deductible. (*See* Ex. M, p. 5, Line 29.)

147.    Specifically, the BioTrax Tracking Form and BioTrax RAR broke out the $16.5 million FMCH paid under the BioTrax Agreement as follows (*See* Ex. M, p. 5):

19

| Line Item | Amount | RAR Position on Deduction |
|---|---|---|
| Actual/Compensatory Damages (Line 29) | $5,500,000 | Allowed |
| Relator Fee (Line 27) | $3,294,868.49 | Disallowed |
| Investigation Costs (Line 28) | $82,282.19 | Disallowed |
| Penalties and Damages (Line 30) | $7,622,849.22 | Disallowed |

148. The IRS referred to the allowed "Actual Compensatory Damages" Found in Line 29 as deductible "single" damages. (*See* Ex. M, p. 16.)

149. The IRS referred to the disallowed Relator Fee, Investigation Costs and Penalties and Damages as non-deductible "multiple" damages. (*See* Ex. M, p. 15.)

150. The BioTrax RAR stated that "FMCH has not established that the entire $16.5 million deducted on their 1999 consolidated tax return was deductible under IRC § 162" and that FMCH "is not allowed a deduction in the amount of $11,000,000, representing multiple damages under the False Claims Act, deemed fines and penalties pursuant to IRC § 162(f)." (*See* Ex. M, p. 30.)

## C. FMCH's Tax Protest and Refund Claim.

151. FMCH protested the IRS' disallowance of $11 million of the BioTrax deduction in the same October 28, 2005 protest that addressed the $192 million disallowance of payments made by FMCH with respect to the Global Agreement.

152. FMCH incorporated the arguments of its protest of the $192 million disallowance into its protest of the $11 million disallowance.

153. FMCH requested that the proposed disallowance be reversed.

154. Prior to a decision concerning FMCH's protest by IRS Appeals, FMCH paid all taxes the IRS said were due.

155. On February 17, 2007, FMCH timely filed a claim for refund, Form 1120X, for 1999 which claimed a refund of the $11 million disallowance.

20

156.    On the same date, February 17, 2007, FMCH timely filed claims for refund, Form
1120X, for 2000 and 2001 which claimed a refund of the allocable share of taxes paid by FMCH
for those years with respect to the remaining amounts the IRS disallowed.

157.    The IRS sent FMCH a Notification of Claim Disallowance by letter dated May
30, 2007 (Ex. K) disallowing the claims for refund for each of the years 1999, 2000 and 2001.

158.    On June 5, 2007, FMCH filed a second protest which, by agreement with the IRS,
incorporated the protest dated October 28, 2005 as the basis for FMCH's disagreement with the
Notice of Claim Disallowance.

### D.      The IRS Concedes FMCH May Deduct Part of the Amount the IRS Termed "Multiple" Damages.

159.    One part of what the IRS considered "multiple" damages and non-deductible was
the Relator Fee. (*See* Ex. M, p. 5, Line 27.)

160.    Specifically, in the RAR, the IRS disallowed FMCH's deduction of the Relator
Fee of $3,294,868.49 as "multiple" damages. (*See* Ex. M, p. 30.)

161.    This amount represents the portion of the payments under the BioTrax Agreement
received by the plaintiffs (relators) of the *qui tam* actions pending against FMCH, NMC, and
their related entities at the time of the BioTrax Agreement. (*See* Ex. I, pp. 13-15.)

162.    In exchange for these payments, FMCH, NMC and their related entities received a
release of the claims the relators made against FMCH, NMC and their related entities in the
relators' *qui tam* actions as detailed in the BioTrax Agreement. (*See* Ex. I, pp. 13-15.)

163.    Because this Relator Fee was part of the $16.5 million FMCH paid under the
BioTrax Agreement, it was deducted on FMCH's 1999 tax return.

164.    FMCH requested the refund of this Relator Fee as part of its refund claim for
1999 covering the disallowance of the entire $11,000,000 deduction.

21

165.    FMCH and the IRS reached a partial settlement, documented by Form 870-AD (Ex. L), which concerned the deductibility of the Relator Fee.

166.    This Form 870-AD explicitly allows FMCH to pursue this refund suit.

167.    The IRS conceded that the Relator Fee (Line 27) was not punitive, but was rather a remedial and compensatory payment deductible pursuant to IRC § 162(a).  Consequently, the IRS agreed that FMCH could deduct the $3,294,868.49.

168.    Pursuant to this agreement, the amount the IRS refunded to FMCH for 1999, $22,281,923, included an allowance for a deduction of the $3,284,868.49.

**E.    Denial of Remaining Refund.**

169.    The IRS has continued to disallow FMCH's refund claim for a deduction of $7,706,131.51, the remaining portion of the $11,000,000 originally disallowed by the RAR.

170.    Had the IRS agreed that FMCH could properly deduct the remaining $7,706,131.51, the IRS would have refunded an additional amount to FMCH for 1999.

**III.    Refunds Now Due**

171.    Because FMCH was entitled to deduct the entire $385,147,334 it paid in 2000 and 2001 under the Civil Agreements as an ordinary and necessary business expense, it is entitled to deduct the remaining $126,796,262 disallowed by the IRS, and therefore to deduct the allocable portion of that amount that is attributable to 1999.

172.    Because FMCH was entitled to deduct the entire $16,500,000 it paid under the BioTrax Agreement on its 1999 tax return as an ordinary and necessary business expense, it is entitled to deduct the remaining $7,706,131.51 disallowed by the IRS.

173.   Based on the Form 1120X for 1999, the amount of income tax that was erroneously and illegally assessed and collected by the IRS with respect to 1999 and which is now due to be refunded to FMCH is $56,607,778.

174.   FMCH noted on its claim for refund, Form 1120X, for 1999 that part of the claimed refund amount results from an error made by the IRS when it erroneously applied a $21,621,509 payment made by FMCH for its taxes due for 2000 to 1999. This application by the IRS does not impact the issues raised in this complaint, but it does impact how any refund due to FMCH in this case will be allocated to each, or any, of the years, 1999, 2000 or 2001.

## COUNT II – 2000

175.   FMCH incorporates the allegations in Paragraphs 1 through 128 as if fully set forth here.

176.   On February 12, 2007, FMCH timely filed a claim for refund, Form 1120X, for 2000 which claimed a refund of the allocable share of taxes paid by FMCH for 2000 with respect to the disallowed $192,596,817 deduction.

177.   The refund of taxes due to FMCH on the Form 1120X for 2000 was $21,621,509.

178.   FMCH and the IRS reached a partial settlement documented by Form 870-AD (Ex. L), which concerned the deductibility of the Relator Fee.

179.   The tax computations related to this partial settlement with the IRS did not allocate any of the taxes paid by FMCH related to the disallowment of the Relator Fee to 2000. The Form 870-AD explicitly allows FMCH to pursue this refund suit for 2000.

180.   Because FMCH was entitled to deduct the entire $385,147,334 it paid in 2000 and 2001 under the Civil Agreements as an ordinary and necessary business expense, it is entitled to

23

deduct the remaining $126,796,262 disallowed by the IRS, and therefore to deduct the allocable portion of that amount that is properly attributed to 2000.

181.    Based on the Form 1120X for 2000, the amount of income tax was erroneously and illegally assessed and collected by the IRS in 2000 and which is now due to be refunded is $21,621,509.

182.    FMCH noted on its Form 1120X for 2000 that part of the refund it was due for 2000 is attributed to a $21,621,509 payment made by FMCH as a designated payment for 2000 taxes, but which the IRS erroneously applied to 1999. FMCH is not seeking a double refund. Instead, FMCH is trying to insure that computations relating to any judgment for this year and each year at issue are correctly done.

## COUNT III – 2001

183.    FMCH incorporates the allegations in Paragraphs 1 through 128 as if fully set forth here.

184.    On February 12, 2007, FMCH timely filed a claim for refund, Form 1120X, for 2001 which claimed a refund of the allocable share of taxes paid by FMCH for 2001 with respect to the disallowed $192,596,817 deduction.

185.    The refund of taxes due to FMCH on the Form 1120X for 2001 was $24,714,463.

186.    FMCH and the IRS reached a partial settlement documented by Form 870-AD (Ex. L), which concerned the deductibility of the Relator Fee.

187.    This Form 870-AD explicitly allows FMCH to pursue this refund suit.

188.    The IRS conceded that the entire Relator Fee (Line 27) was not punitive, but was rather a remedial and compensatory payment deductible pursuant to IRC § 162(a).

24

Consequently, the IRS agreed that FMCH could deduct the $65,800,555 paid to relators under the Civil Agreements and the $3,294,868.94 paid to relators under the BioTrax Agreement.

189.    Pursuant to this agreement, the IRS refunded $2,158,339 (exclusive of interest) of taxes previously paid for 2001.

190.    Because FMCH was entitled to deduct the entire $385,147,334 it paid in 2000 and 2001 under the Civil Agreements as an ordinary and necessary business expense, it is entitled to deduct the remaining $126,796,262 disallowed by the IRS, and therefore to deduct the allocable portion of that amount that is properly attributed to 2001.

191.    Based on the Form 1120X, the amount of income tax that was erroneously and illegally assessed and collected by the IRS with respect to 2001 and which is now due to be refunded is $22,556,124.

## JURY DEMAND

192.    Pursuant to 28 U.S.C. § 2402 and Federal Rule of Civil Procedure 38(b), FMCH requests trial by jury.

WHEREFORE, FMCH demands judgment in its favor and against the United States of America:

i.      with respect to Count I, in the amount of $56,607,778, or such other amount as may be legally refundable, plus interest as provided by law;

ii.     with respect to Count II, in the amount of $21,621,509, or such other amount as may be legally refundable, plus interest as provided by law;

iii.    with respect to Count III, in the amount of $22,556,124, or such other amount as may be legally refundable, plus interest as provided by law;

iv.     for FMCH's costs, attorneys' fees, and other such relief as this Court deems appropriate.

Dated: December 22, 2008

Respectfully submitted,

FRESENIUS MEDICAL CARE HOLDINGS, INC.

By its attorneys,

Michael Kendall (MA BBO #544866)
MCDERMOTT WILL & EMERY LLP
28 State Street
Boston, Massachusetts 02109-1775
(617) 535-4000
mkendall@mwe.com

*Of Counsel*:
David S. Rosenbloom
Thomas C. Borders
Jeffrey Baltruzak
MCDERMOTT WILL & EMERY LLP
227 West Monroe Street
Chicago, Illinois 60614
(312) 372-2000
drosenbloom@mwe.com
tborders@mwe.com
jbaltruzak@mwe.com

26