UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| FRESENIUS MEDICAL CARE HOLDINGS, INC., | ) ) ) | |
| Plaintiff, | ) ) | CIVIL ACTION NO. 08-12118-DPW |
| v. | ) ) | |
| UNITED STATES OF AMERICA, | ) ) | |
| Defendant. | ) | |

MEMORANDUM AND ORDER
May 9, 2013

Plaintiff Fresenius Medical Care Holdings, Inc. ("Fresenius") brought suit to recover taxes paid on $126,796,262 of a $385,147,334 civil settlement with the government, which resolved Fresenius' potential liability under the False Claims Act ("FCA"), 31 U.S.C. §§ 3729-3733, and other statutory and common law causes of action.  Fresenius claimed the entire settlement amount was tax deductible as an ordinary and necessary business expense under 26 U.S.C. § 162(a).  Having already agreed that $258,351,072 was deductible, the IRS viewed the remaining $126,796,262 at issue as a penalty ineligible for deduction under 26 U.S.C. § 162(f).  Following trial, a jury concluded that the IRS improperly refused to allow Fresenius to deduct $95,000,000 of the amount in dispute.

Fresenius has now moved for entry of final judgment in the amount of $50,420,512.34 plus interest in accordance with law.  I

will allow the motion and take the occasion to provide a full explanation of the reasons why I earlier denied summary judgment to the government and denied the parties' motions for judgment as a matter of law.

## I.   BACKGROUND

### A.   *The Global Settlement Agreement*

Between 1993 and 1997, whistle-blowers brought ten civil actions against National Medical Care, Inc. ("NMC") under the FCA, alleging that NMC divisions LifeChem, Inc. ("LifeChem"), NMC Medical Products Group, Inc. ("MPG"), and NMC Homecare, Inc. ("Homecare") engaged in a conspiracy to defraud Medicare and other federal healthcare programs by double billing, paying kickbacks, ordering unnecessary laboratory tests, and retaining Medicare overpayments.  The relevant misconduct here involves three categories of FCA violations: (1) those committed by LifeChem in connection with fraudulent laboratory testing claims, (2) those committed by Homecare in connection with fraudulent intradialytic parenteral nutrition ("IDPN") claims, and (3) those related to what the parties called "the credit balance issue" regarding failure to report and repay overpayments received from Medicare.  In 1995, the Office of the Inspector General of the United States Department of Health and Human Services initiated criminal and civil investigations into these and other

allegations of fraud.  NMC became a wholly owned subsidiary of Fresenius in 1996.

On January 18, 2000, Fresenius and the United States entered into a global settlement agreement (the "Global Agreement") resolving claims against Fresenius and its subsidiaries.  The Global Agreement consisted of a master agreement, three criminal plea agreements (the "Criminal Agreements") and four civil settlements (the "Civil Agreements").  Fresenius agreed to pay the United States $101,186,898 pursuant to the Criminal Agreements and $385,147,334 pursuant to the Civil Agreements.

All eight agreements are interconnected.  Each Civil Agreement states that, "[a]s an express condition of the Settlement Agreement," Fresenius will undertake certain actions "to secure NMC's and Fresenius's payment obligations under . . . this Agreement (and the other civil Settlement Agreements and criminal Plea Agreements being executed contemporaneously)."  In each of the Criminal Agreements, "the United States agrees that it will not seek a separate restitution order" due to the Civil Agreements from which "the loss suffered by each of the federal health care programs will be recompensed."

The Civil Agreements provide for the release of Fresenius from civil and administrative claims under the FCA, the Program Fraud Civil Remedies Act, 31 U.S.C. §§ 3801-12, the Civil Monetary Penalties Law, 42 U.S.C. § 1320-7a, and the common law,

as well as for the dismissal of the pending *qui tam* suits.  The Civil Agreements designate $65,800,555 of the $385,147,334 paid by Fresenius to the United States as awards to the relators in the associated *qui tam* suits.

With the exception of the sum designated for the relators, the Civil Agreements include no provisions otherwise governing or describing how the United States would allocate the damages.

Each Civil Agreement states:

> Notwithstanding any term of this Agreement, the United States specifically does not release [Fresenius or its subsidiaries] or any individual from . . . any potential criminal, civil or administrative claims arising under Title 26, U.S. Code (Internal Revenue Code) . . . .

In a later section, the Civil Agreements each provide:

> Nothing in this Agreement constitutes an agreement by the United States concerning the characterization of the amounts paid hereunder for purposes of any proceeding under Title 26 of the Internal Revenue Code.

Each of the Civil Agreements additionally provides:

> NMC Homecare, NMC and FMCH, and the NMC Companies waive and will not assert any defenses these entities may have to any criminal prosecution or administrative action relating to the conduct described . . . which defenses may be based in whole or in part on a contention that, under the Double Jeopardy Clause of the Fifth Amendment of the Constitution or Excessive Fines Clause of the Eighth Amendment of the Constitution, this Settlement Agreement bars a remedy sought in such criminal prosecution or administrative action.  NMC Homecare, NMC, FMCH, and the NMC Companies further agree that nothing in this Agreement is punitive in purpose or effect.

Each of the Civil Agreements also contains an integration clause.

-4-

**B.    Tax Returns and IRS Examination**

Fresenius claimed deductions for the full payments under the Civil Agreements, affecting its tax payments for the years 1999, 2000, and 2001.  The Internal Revenue Service ("IRS") subsequently examined Fresenius' 1999, 2000, and 2001 tax returns.  The IRS sent Fresenius a "Notice of Proposed Adjustment" finding that $192,550,517 of the settlement payments were properly deductible, but disallowing deduction of $192,596,817 in payments that the IRS deemed punitive.

On October 28, 2005, Fresenius filed with the IRS a protest of the disallowance of deductions related to the Civil Agreements.  Fresenius stated that the full settlement amounts were properly characterized as compensatory payments and that the disallowances should therefore be reversed.  Prior to a decision by the IRS Appeals Office, Fresenius paid all of the taxes and related interest the IRS said was due.  The IRS Appeals Office subsequently agreed that the $65,800,555 paid to relators were deductible and refunded taxes paid on that sum.  However, the IRS maintained its disallowance of the deductions of the remaining $126,796,262 that Fresenius paid pursuant to the Civil Agreements.

-5-

*C.   Procedural History*

On December 22, 2008, Fresenius filed this suit to recover taxes paid on the $126,796,262 on which the IRS had disallowed deductions.[1]

Fresenius filed a motion for summary judgment contending that the sums designated by the civil settlement were compensatory and therefore deductible because, under the plain language of the Civil Agreements, Fresenius and its subsidiaries "agree that nothing in this Agreement is punitive in purpose or effect." Judge Saris issued a Memorandum and Order on June 25, 2010, denying Fresenius' motion. "[B]ecause of [the] conflicting language in the agreements, the placement of the nothing-punitive language, and its wording," Judge Saris reasoned, "the contract is ambiguous, making the issue of the purpose of the payments inappropriate for summary judgment." *Fresenius Med. Care Holdings, Inc*. v. *United States*, No. 08-12118-PBS, Order at 12 (June 25, 2010).

Following additional discovery regarding the purpose of the payments, and reassignment of the case to my docket, the government filed its own motion for summary judgment. The government contended that, because parties did not agree that the

---

[1]Fresenius also brought a claim seeking deductions on an additional $7,706,131.51 paid to settle allegations of FCA violations committed by two other NMC subsidiaries, BioTrax International, Inc. ("BioTrax") and NMC Diagnostics, Inc. ("Diagnostics").  Fresenius abandoned that claim prior to trial.

entirety of the settlement constituted compensatory damages, Fresenius could not meet its burden of showing it was entitled to deduct the disputed sum as an ordinary and necessary business expense.  At a hearing on February 1, 2012, I denied the motion, for reasons I discuss more fully below.  I also allowed Fresenius additional discovery regarding losses and expenses incurred by the government that were the subject of the settlements at issue.

The case proceeded to trial in August 2012.  The jury returned a verdict in favor of Fresenius, finding that $95,000,000 of the disputed settlement payments was compensatory and thus deductible as an ordinary and necessary business expense.  I denied the parties' pending motions for judgment as a matter of law on March 29, 2013, and directed the parties to engage further in an effort to agree upon the form of final judgment to be entered.

The parties had agreed that, based on the jury's finding of an additional $95,000,000 in deductible expenses, Fresenius' tax overpayment was $42,913,536.78.  The parties initially disputed the extent to which a computation of statutory interest should have been included in the final judgment.  They eventually agreed in response to my order of March 29, however, that as of May 31, 2013, Fresenius would be entitled under the jury's verdict to an overpayment judgment of $50,420,512.34 plus interest thereafter

according to law subject to the possibility of further adjustment through a post judgment administrative process if necessary.

In addition to directing the Clerk to enter the final judgment the parties have agreed upon, this Memorandum and Order details why I allowed this case to proceed to trial and why I view the jury's fact finding--rather than some legal determination by the court--to be determinative.

### III.   DENIAL OF SUMMARY JUDGMENT

#### A.   *Tax Deductibility and the FCA*

The Internal Revenue Code "allow[s] as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business."  26 U.S.C. § 162(a).  A payment made in settlement of a claim against a business may constitute such an ordinary and necessary expense.  *See, e.g., Comm'r* v. *Pacific Mills*, 207 F.2d 177, 180 (1st Cir. 1953).  However, the statute excludes from the category of ordinary and necessary business expenses "any fine or similar penalty paid to a government for the violation of any law."  26 U.S.C. § 162(f).  Because income tax deductions "are matters of legislative grace[,] the taxpayer bears the burden of proving entitlement to any deduction or credit claimed."  *MedChem (P.R.), Inc.* v. *Comm'r*, 295 F.3d 118, 123 (1st Cir. 2002) (citing *INDOPCO, Inc*. v. *Comm'r*, 503 U.S. 79, 84 (1992)).

Treasury regulations define a "fine or similar penalty" under 26 U.S.C. § 162(f) to include amounts "[p]aid as a civil penalty imposed by Federal, State, or local law" and amounts "paid in settlement of the taxpayer's actual or potential liability for a fine or penalty (civil or criminal)."  26 C.F.R. § 1.162-21(b)(1).  However, "[c]ompensatory damages . . . paid to a government do not constitute a fine or penalty."  26 C.F.R. § 1.162-21(b)(2).

As a general proposition, courts typically determine whether payment on a civil liability is deductible based on the purpose indicated by the statute that is the source of liability.  *See Bailey* v. *Comm'r*, 756 F.2d 44, 47 (6th Cir. 1985) ("The characterization of a payment for purposes of § 162(f) turns on the origin of the liability giving rise to it."); *accord True v. United States*, 894 F.2d 1197, 1205 (10th Cir. 1990); *Waldman* v. *Comm'r*, 88 T.C. 1384, 1388 (1987), *aff'd* 850 F.2d 611 (9th Cir. 1988); *Huff* v. *Comm'r*, 80 T.C. 804, 824 (1983); *Mid. Atlantic Distribs. Inc.* v. *Comm'r*, 72 T.C. 1136, 1145 (1979).  I turn, then, to the purpose of civil liability under the FCA, which provided the overarching structure for the settlement.[2]

---

[2]  Although the settlement agreements at issue indicate that the government and Fresenius settled claims pursuant to various statutes, the dispute has focused on the status of payments under the multiple damages provisions of the FCA.

1.  Characterization of FCA Liability

The FCA provides for "a civil penalty of not less than $5,000 and not more than $10,000 . . . plus 3 times the amount of damages which the Government sustains because of the act of that person."  31 U.S.C. § 3729(a)(1).  The FCA's civil penalties are plainly punitive, and "single" damages for losses sustained by the government are plainly compensatory.  The unfolding of Supreme Court case law, however, has made characterization of "multiple" damages under the FCA more nuanced.

A prior version of the FCA authorized only double damages, which the Supreme Court characterized as "necessary to compensate the Government completely for the costs, delays, and inconveniences occasioned by fraudulent claims."  *United States* v. *Bornstein*, 423 U.S. 303, 315 (1976).  However, after the FCA was amended to provide for treble damages, False Claims Amendments Act of 1986, Pub. L. 99-562, § 2(7), 110 Stat. 3153, the Court observed that "the current version of the FCA imposes damages that are essentially punitive in nature."  *Vermont Agency of Natural Resources* v. *United States ex rel. Stevens*, 529 U.S. 765, 784 (2000).  The Court thus held that a private citizen could not bring suit under the FCA against a State, because State *qui tam* liability would be inconsistent with the "presumption against imposition of punitive damages on governmental entities." *Id.* at 785.

-10-

After *Bornstein* and *Stevens*, characterization of FCA damages might have been fairly straightforward:  the first third of FCA liability, or "single" damages, would be direct compensation for the government's losses; the second third would be categorically compensatory under *Bornstein*; and the last third would be categorically punitive under *Stevens*.  Such a categorical approach has the obvious benefit of ease of administration because it would eliminate subsidiary disputes about the tax characterization of FCA damages.  Moreover, the scheme would be consistent with the provision of the FCA permitting the court to reduce treble damages as low as double damages in the case of a cooperative defendant.  31 U.S.C. § 3729(a)(2).  Thus, under a categorical view of the "double" damages portion as compensatory and the "treble" portion as punitive, the court would maintain full discretion whether punitive liability should be imposed on defendants presumably less deserving of punishment.

In *Cook County* v. *United States ex rel. Chandler*, 538 U.S. 119 (2003), however, the Court seems to have abandoned prior indications of a categorical approach to characterizing multiple damages under the FCA.  Applying the same presumption against imposing punitive damages on governmental entities as that reaffirmed in *Stevens*, the Court in *Cook County* held that local governments are nevertheless eligible defendants in *qui tam* actions under the FCA.  *Id.*  In doing so, the Court emphasized

that the FCA's "damages multiplier has compensatory traits along with the punitive." *Id.* at 130.  That is because, as recognized in *Bornstein*, "some liability beyond the amount of the fraud is usually necessary to compensate the Government completely for the costs, delays, and inconveniences occasioned by fraudulent claims." *Id.* (internal quotation omitted).  For example, "single" damages may fail to cover pre-judgment interest or consequential damages.  *Id.* at 131.

Thus, the Court refused to view any portion of multiple damages under the FCA as necessarily remedial or punitive, and instead viewed the task of characterizing "multiple" damages as a fact-dependent inquiry.  Although the "FCA's treble damages remedy is still 'punitive' in that recovery will exceed full compensation in a good many cases," the "tipping point between payback and punishment defies general formulation, being dependent on the workings of a particular statute and the course of particular litigation." *Id.*  Multiple damages thus serve remedial rather than purely punitive purposes as necessary to make the government whole, in light of the facts of any particular FCA litigation.

## 2.  Settlement of FCA Liability

Settlement of FCA claims adds additional complications to characterization of liability, given the variety of considerations impacting the settlement decision beyond a

specific accounting damages--for example, the value of avoiding the costs and risks of litigation.  Because multiple damages payments pursuant to the FCA can be compensatory or punitive, *Cook County*, 538 U.S. at 130, the purpose of payments made to settle FCA liability will need to be clarified.

Throughout this litigation, the government relied heavily on *Talley Indus., Inc.* v. *Comm'r* [*Talley 3*], 1999 WL 407454 (T.C. 1999), *aff'd* 18 F. App'x 661 (9th Cir. 2001), for the proposition that the parties must agree on the purpose of a settlement payment in order to characterize the payment as compensatory for tax purposes.  *Talley 3* was the third in a series of four decisions: (1) the Tax Court decided on summary judgment the compensatory nature of an FCA settlement, *Talley Indus., Inc.* v. *Comm'r* [*Talley 1*], 68 T.C.M. (CCH) 1412 (1994); (2) the Ninth Circuit reversed and remanded, *Talley Indus. Inc.* v. *Comm'r* [*Talley 2*], 116 F.3d 382, 387 (9th Cir. 1997); (3) the matter was then tried before a factfinder in *Talley 3*, 1999 WL 407454; and (4) the Tax Court's *Talley 3* decision was finally upheld on appeal by the Ninth Circuit, *Talley Indus., Inc.* v. *Comm'r* [*Talley 4*], 18 F. App'x 661 (9th Cir. 2001).  In *Talley 3*, the Tax Court judge held that the tax characterization of a settlement payment was ambiguous under the agreement.  After a hearing on the extrinsic evidence, the judge found that "[t]he record show[ed] that the parties did not agree whether the

portion of the settlement in excess of the Government's 'singles' damages would constitute compensation to the Government for its losses," and thus the taxpayer had "failed to establish entitlement to a deduction for the disputed portion of the settlement." *Talley 3*, 1999 WL 407454, at *8.

I conclude, however, that a manifest agreement is not necessary for Fresenius to establish that all or some portion of the payments at issue were made in settlement of non-punitive FCA liability. 26 C.F.R. § 1.162-21(b)(1)(iii); *id.* § 1.162-21(b)(2).

It is instructive to start from the perspective of litigated liability as opposed to settlement. In cases in which FCA liability is determined by litigation, the government need only prove its single damages, after which multiple damages are applied as a matter of course. 31 U.S.C. § 3729(a)(1). Even in "cooperating defendant" situations, 31 U.S.C. § 3729(a)(2), there is no guarantee that, in the process of determining an appropriate damages reduction, the court will specify the extent to which even the reduced damages are punitive or compensatory, or that the court will create a record detailing the extent to which compensating the government requires more than "single" damages. The lack of a clear breakdown of the purpose of multiple damages in a litigation setting, however, plainly does not mean the IRS may exercise complete discretion in the

characterization of the payments.  Indeed, it would be prudent of the parties to seek--and in any event for the court to secure--special findings regarding the proper characterization of any damage award.  This is no less true in the context of settlement.

Because the FCA does not categorically determine the purpose of the payments, a factfinder must determine to what extent "multiple" damages payments are, in fact, compensatory.  And, even in the context of settlement, the parties' joint intent is not the exclusive means of doing so.  Examining the potential characterization of liability if the case had been litigated, for example, may shed light on whether settlement payments were made to resolve compensatory or punitive liability.  The Supreme Court explained in *Cook County* that the need to compensate the government for *qui tam* relators' fees, interest, and consequential damages might render multiple damages remedial. *Cook County*, 538 U.S. at 130-31.  When the amount of pre-judgment interest or consequential damages necessary to make the government whole is sufficiently large, the entirety of a treble damages award could be compensatory, leaving only the civil penalty portion of FCA liability as the punitive component. Under such circumstances, a factfinder could easily find it more likely than not the case that settlement payments made to resolve such liability had a compensatory purpose.

This case also illustrates the potential difficulties of looking exclusively to the parties' intent when the Department of Justice declines to resolve the question of tax liability contemporaneously with the settlement of the underlying civil liability.  Here, DOJ stated from the outset that "[t]he United States Attorneys' Offices, Department of Justice components, and related federal agencies involved in this investigation are without authority to resolve any tax matter relating to these discussions and any underlying conduct by NMC."  On this basis, the DOJ refused to resolve the characterization of the settlement payments for tax purposes for part of the settlement.  Under the government's approach here, which is the government's traditional and customary approach regarding ancillary tax liability, the DOJ ensured that the settlements would not by agreement be found compensatory because it refused to characterize the payments.  In other words, in the government's view, it was the DOJ's unilateral declination to resolve tax matters that resolved those very same matters in the government's favor.

None of this is to say that the intent of the parties is irrelevant for purposes of characterizing the settlement payments.  Indeed, a characterization agreed upon by the parties, and/or announced by a judicial officer, may well be determinative for purposes of taxation.  *Compare Stephens* v. *Comm'r*, 905 F.2d 667, 673 (2d Cir. 1990) (characterizing award of restitution as

-16-

compensatory based on intent of sentencing judge).  The point is only that aspects of "make-whole" recovery can be proved independently of any express agreement or the lack of one, through proof of interest calculations, attorneys' billable hours, and expense records.  While the parties' negotiations also may provide evidence of the compensation due to the government, these negotiations and the eventual settlement agreement will seldom be the sole evidence available to foresighted parties.

Ultimately, to determine whether the payments made by Fresenius to the government in excess of the amount already deemed deductible by the IRS were compensatory damages, it was necessary to consider both the language of the settlement agreements and non-contractual evidence regarding the purpose and application of the payments.

## B.   *The Settlement Agreements*

Judge Saris denied Fresenius' motion for summary judgment, holding that the language of the agreements is ambiguous.  While I too would have denied the motion, I have a somewhat different take regarding the proper characterization of the settlement language as it relates to the instant case.  I find the Civil Agreements unambiguously decline to address the punitive or compensatory nature of the settlement payments for the purposes of the Internal Revenue Code.

The Civil Agreements are governed by federal common law.
*See United States* v. *Seckinger*, 397 U.S. 203, 209-10 (1970)
(holding that federal common law controls the interpretation of
contracts entered into by the United States pursuant to its
statutory powers).  "In construing the terms of contracts that
are governed by federal common law, we are guided by 'common-
sense canons of contract interpretation.'  One such canon teaches
that contracts containing unambiguous language must be construed
according to their plain and natural meaning." *Smart* v. *Gillette
Co. Long-Term Disability Plan*, 70 F.3d 173, 178 (1st Cir. 1995)
(internal citation omitted).  Whether a contract is ambiguous is
a question of law.  *Nault* v. *United States*, 517 F.3d 2, 4 (1st
Cir. 2008).  "Contract language is usually considered ambiguous
where an agreement's terms are inconsistent on their face or
where the phraseology can support reasonable differences of
opinion as to the meaning of the words employed and obligations
undertaken." *Smart*, 70 F.3d at 178 (quoting *Fashion House, Inc.*
v. *K mart Corp.*, 892 F.2d 1076, 1083 (1st Cir. 1989)).

The Civil Agreements state that Fresenius and its
subsidiaries "further agree that nothing in this Agreement is
punitive in purpose or effect."  Standing alone, the phrase
"nothing in this Agreement is punitive in purpose or effect" is
ambiguous.  However, while the phrase might be read to
characterize the payments as a general matter (and therefore for

-18-

the purposes of the tax code), in context it is addressed to characterizing the payments as non-punitive for the purposes of the Double Jeopardy and Excessive Fines Clauses.

The two interpretations are crucially different.  The Supreme Court has "long recognized that the Double Jeopardy Clause does not prohibit the imposition of all additional sanctions that could, 'in common parlance,' be described as punishment."  *Hudson* v. *United States*, 522 U.S. 93, 98-99 (1997). The Ninth Circuit has explained that "non-punitive" for the purposes of the Double Jeopardy Clause does not mean "non-punitive" for the purposes of the Internal Revenue Code:

> That the double damages portion of the penalty imposed by the FCA does not constitute criminal "punishment" within the meaning of the Double Jeopardy Clause . . . does not mean that such damages are not within the ambit of section 162(f).

*Talley 2*, 116 F.3d at 387.  In short, "whether a payment is deemed compensatory for double jeopardy purposes does not determine whether the payment is deductible under the Tax Code." *Id.*

Judge Saris held that "one reasonable interpretation of the nothing-punitive language [in the agreements] was that it was intended to nail down the waiver in the uncertain area of the law governing when a civil penalty constitutes criminal punishment." I go one step further to hold that this is, as a matter of law, the only reasonable interpretation of the settlements' language.

The placement of the sentences at issue indicates that "punitive" in the Civil Agreements means "punitive" within the context of the Double Jeopardy and Excessive Fines Clauses.  Each of the quoted sentences is located within a paragraph waiving Fresenius' rights under the Double Jeopardy Clause of the Fifth Amendment and the Excessive Fines Clause of the Eighth Amendment.

Moreover, other provisions within the settlement agreements expressly state that the agreements do not characterize the settlement payments as non-punitive for the purposes of the Internal Revenue Code.  Each of the Civil Agreements states:

> Notwithstanding any term of this Agreement, the United States specifically does not release [Fresenius or its subsidiaries] . . . from . . . any potential criminal, civil or administrative claims arising under Title 26, U.S. Code (Internal Revenue Code) . . . .

The Civil Agreements additionally provide:

> Nothing in this Agreement constitutes an agreement by the United States concerning the characterization of the amounts paid hereunder for purposes of any proceeding under Title 26 of the Internal Revenue Code.

In the briefing submitted to Judge Saris, Fresenius argued that the sentence in each agreement stating that the agreement is not punitive "is not a tax characterization" that determines how to treat the payment for tax purposes, but instead "a fact that bears on the tax analysis, just as it bears on any analysis that inquires, as a factual matter, whether the payment is punitive." That argument stretches the language to the point of distortion. While the distinction between a "tax characterization" and "a

fact that bears on the tax analysis" is a fair one, Fresenius does not suggest any reason that the parties would wish to characterize the settlement payment as generally non-punitive *other* than to provide a factual basis for a future tax characterization.

If the parties had intended to state a fact solely in order to anchor a tax characterization, they would have rendered the clauses denying that the agreements characterize the settlement for tax purposes superfluous.  These denials would be technically true but practically meaningless.  Fresenius does not suggest any purpose for the denial clauses if the disputed phrases are interpreted in the manner that they propose.

Most importantly for the purposes of contract interpretation, reading the disputed sentences in full reveals their "plain and natural meaning." *Smart*, 70 F.3d at 178.  In the contract, only Fresenius and its subsidiaries (and not the government) agree that the purpose of the settlement is non-punitive.  Judge Saris read this to bolster the interpretation that the sentences mean "punitive" in the context of the Double Jeopardy Clause.  I hold that the unilateral nature of this aspect of the "agreement" conclusively indicates that this one-sided "agreement" does not relate to the agreements' compensatory nature for the purposes of 26 U.S.C. § 162(f).

Fresenius' unilateral belief, intent or fervent hope  that
the settlement payments are non-punitive is insufficient as a
basis for a characterization pursuant to the Internal Revenue
Code.  Even if a taxpayer believes that a settlement is non-
punitive, that does not "determine which purpose the payment was
designed to serve." *Waldman*, 88 T.C. at 1387.  The payment might
be shown to recompense the government based on a calculation of
the government's actual losses, broadly construed as described by
the Supreme Court in *Cook County*.  Alternatively, the taxpayer
*and* the government might agree to characterize the payments as
compensatory, punitive, or some combination of the two.  However,
there is no legal principle instructing that a taxpayer's
unilateral characterization can serve as a foundation for
deciding how to characterize the payment.

Fresenius' stipulation that the settlements are not punitive
does not establish or even suggest that the government has agreed
to characterize the settlements in this way.  A statement that
Fresenius alone believes that the settlement payments are tax
deductible achieves nothing.  From all that appears, this one-
sided stipulation was dropped into the Agreements in part as an
element of the failed effort by Fresenius to secure agreement or
otherwise give the illusion of agreement regarding tax
characterization when there was none.

While the phrases to which the parties did agree that "this Agreement is not punitive in purpose or effect" and that "nothing in this Agreement is punitive in purpose or effect" might appear ambiguous standing alone, their context resolves the ambiguity. The placement of these phrases within the paragraph discussing the Double Jeopardy and Excessive Fine Clauses, the provisions within the settlement agreement denying that the agreements characterize the settlement payments for the purposes of the Internal Revenue Code, and the one-sided "agreement" in which only Fresenius and its subsidiaries acknowledge that the settlements are non-punitive conclusively indicate that the phrases cannot be construed as Fresenius contends. The settlement lacks an agreement by the parties as to the characterization of the settlement payments as remedial or punitive for tax purposes.

## C.   *Non-Contractual Evidence*

Because the settlement agreements do not characterize the payments at issue, I turn to non-contractual evidence of the purpose served by the payments to determine whether they were compensatory or punitive. On the summary judgment record, the government had not shown that the settlement payments were punitive as a matter of law. The government relied primarily on three pieces of evidence.

-23-

First, the government stated that "although Fresenius
acknowledges that parties can negotiate anything in a settlement,
while negotiating the Global Agreement, Fresenius did not propose
to characterize the payments as singles, multiples, interest,
etc."[3]  The government cited to the depositions of Alan Reider
and Ronald Castle, who represented Fresenius in settlement
negotiations, in which they acknowledged that (1) Fresenius'
settlement proposals did not identify a specific allocation of
the damages for interest, (2) Fresenius "never characterized it[s
offers] as pre-judgment interest or anything else," and (3) the
government's damages calculations employed multipliers and
penalties instead of the statutory interest rate.

Second, Reider admitted he "recall[ed] no conversation with
the government discussing whether something was compensatory or
not."

Finally, the government argued that "the settlement, by its
nature, reflected a compromise influenced by a number of factors
including the hazards" of litigation.  The government cited to
(1) Castle's statement that "you can negotiate in settlement
anything," (2) Reider's statement that "you can apply whatever

---

[3]  The government additionally contended that "during the
negotiations of the Global Agreement, Fresenius did not
characterize its offers as 'compensation' to the Government and
did not secure a characterization of any portion of the payment
as compensation to the Government; nor did [] the United States
manifest an acceptance of such characterization."  This argument
appears to echo the argument above.

meaning you want" to a settlement offer, and (3) Reider's explanation that "[t]he principal basis for [the parties'] discussion was the validity of our position and our view that if this went to litigation we felt we would win" and that the only other way Fresenius argued for a lower multiplier was "a variation on litigation risk."

None of the statements cited by the government established as a matter of law that the disputed payments under the Civil Agreements were not compensatory.  None of the statements indicated knowledge on the part of Fresenius' lawyers about what expenses the government incurred to investigate the FCA violations.  None of the statements indicated knowledge about what interest rate represented the lost opportunity cost to the government from the delayed payments.  And the statements did not establish the extent to which the settlement payments recompensed the government for its losses or the extent to which they exceeded those losses.

To the contrary, Fresenius raised a genuine dispute of material fact that at least some of the multiple damages were compensatory.

The documents exchanged in settlement negotiations, for example, indicated that making the government whole would have required payment of a substantial amount of pre-judgment interest.  In a December 9, 1998, letter regarding the regarding

the credit balance issue, Assistant U.S. Attorney Suzanne Durrell sought to justify DOJ's multiple damages demands by citing an amount of pre-judgment interest owed to the government that exceeded even treble damages.  In a March 18, 1999, settlement offer regarding the claims involving Homecare, DOJ included a notice on pre-judgment interest stating that "the United States, as a matter of federal common law, is entitled to recover prejudgment interest . . . in order to compensate it completely for the loss of the use of the money due as damages."  Moreover, in the credit balance component of a September 27, 1999, Global Settlement Proposal, the DOJ sought multiple damages, but no interest, on claims under the FCA, but sought single damages and interest on claims under other laws pursuant to which multiple damages were unavailable; from this, one could reasonably infer that the multiple damages pursuant to the FCA included pre-judgment interest to compensate the government for its losses.

The statements of Fresenius attorneys gave further support to the proposition that the multiple damages, at least in part, represent compensatory elements.  Reider stated that the government justified the reasonableness of its demands by demonstrating that Fresenius' liability would be greater based on a single damages calculation plus interest, as opposed to a multiplier approach.  Castle stated that "[t]he Government, at different times, identified things that it believed it should be

compensated for in connection with the investigation and resolution of the case." According to Castle, the government always took the position that the settlement would equal at least single damages and interest. Fresenius (in this respect not unlike the government) also characterized its offers as "single loss plus something," where the additional component was compensatory damages.

In short, on the summary judgment record, I found as a matter of law that the parties did not agree the settlement payments were compensatory, but that a genuine dispute remained whether any part of the multiple damages were compensatory in fact.

## IV.   TRIAL, POST-TRIAL MOTIONS, and VERDICT

The parties continued to pursue similar theories at trial. Fresenius emphasized language in the agreements indicating that payments were not punitive, and argued that the multiple damages were designed to compensate the government for, primarily, pre-judgment interest. The government argued that Fresenius could not prove the compensatory nature of the payments without agreement of the parties. The government also tried to rebut the notion that multiple damages were designed to compensate the government for interest--for example, by arguing that negotiated multipliers for particular losses were set based on the

egregiousness of the fraudulent conduct creating those losses, rather than particular monetary amounts owed.

In support of post-trial motions for judgment as a matter of law, the parties highlighted largely unremarkable testimony from the trial.  For example, Assistant U.S. Attorney Susan G. Winkler, who had been involved in settlement negotiations, confirmed that multiple damages "have many purposes," one of which is to compensate the government for interest.  More helpful to Fresenius' case was Winkler's testimony that only limited portions of the multipliers in the government's September 27, 1999, settlement proposal reflected resolution of the per-claim penalty under the FCA; for example, Winkler testified that in a 3.2 multiplier imposed on particular losses, only the last two-tenths of the multiplier reflected FCA penalties.

Nevertheless, real disputes remained about the purposes of the payments.  As the government emphasized, Castle admitted "the idea of including exactly specific items of single loss versus multipliers versus interest versus other things was, I don't recall it ever being raised by either side."  With apparently little attention paid to the nature of the payments during settlement negotiations, Fresenius certainly faced an uphill battle in proving the compensatory character of the payments. Given the mixed evidence about the extent to which the disputed settlement payments were remedial, the evidence presented at

trial did not allow me to find that a "reasonable jury could not render a verdict" in favor of either party. *Irvine* v. *Murad Skin Research Laboratories*, Inc., 194 F.3d 313, 316 (1st Cir. 1999). I accordingly allowed to case to proceed to verdict.

As already recounted, the jury returned a verdict finding that $95,000,000 of the $126,796,262 in disputed settlement payments were compensatory and therefore deductible. Based on the large amount of pre-judgment interest necessary to make the government whole on losses incurred by the fraud, it was reasonable for the jury to conclude that a vast majority of the settlement payments were compensatory. This is particularly so given that the global settlement included criminal plea agreements imposing fines of $101,186,898, which the jury reasonably might have concluded were intended to cover the bulk of punitive damages against Fresenius for the fraud. That said, the jury also reasonably allowed Fresenius only part of its requested deduction. Fresenius could not, after all, present a precise accounting of pre-judgment interest owed to the government, and there was evidence to show that some portion of payments were made to settle Fresenius' liability in the form of mandatory penalties under the FCA.

In the final analysis, the jury struck a balance between evidence supporting Fresenius' theory that the settlement was entirely compensatory even without the agreement of the parties,

and the government's evidence that at least some portion of the settlement resolved punitive liability under the FCA.  I will not upset the verdict, which reflects a reasonable view of the evidence and a fair resolution of this case.

### V.   CONCLUSION

For the reasons discussed more fully above, plaintiff's renewed motion for entry of final judgment, Dkt. No. 146, is GRANTED.  The Clerk shall enter final judgment in this matter on May 31, 2013, in accordance with the form of judgment agreed upon by the parties.


/s/ Douglas P. Woodlock
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE